AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

District of New Mexico

☐▼

In the Matter of the Search of

*(Briefly describe the property to be searched
or identify the person by name and address)*

24 DEVICES LOCATED IN THE IRS CRIMINAL
INVESTIGATIONS EVIDENCE ROOM AT 6200
JEFFERSON ST. NE, ALBUQUERQUE, NM 87109

)
)
)
)
)
)
)

Case No.  **23 MR 119**

**FILED**

United States District Court
Albuquerque, New Mexico

Mitchell R. Elfers
Clerk of Court

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A, hereby incorporated by reference.

located in the _____ District of _____ New Mexico _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, hereby incorporated by reference

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC 666 | Theft or Bribery concerning programs receiving Federal Funds |
| 18 USC 1956 (a)(1) | Laundering of monetary instruments |
| 18 USC 1343 | Wire Fraud and Honest Services Fraud |
| 18 USC 1346 | |

The application is based on these facts:

See Attached Affidavit

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Crystal Chavez Special Agent IRS-CI

*Printed name and title*

**Submitted electronically and Sworn telephonically before me**

Date:  January 17, 2023

*Judge's signature*

**Karen B. Molzen, United States Magistrate Judge**

*Printed name and title*

City and state:  Albuquerque, NM

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF 24 DEVICES LOCATED IN THE IRS CRIMINAL INVESTIGATIONS EVIDENCE ROOM AT 6200 JEFFERSON ST. NE, ALBUQUERQUE, NM 87109 | Case No. _____ |

**AFFIDAVIT IN SUPPORT OF APPLICATION
UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE**

1.      I, Crystal Chavez, Special Agent of the Internal Revenue Service, Criminal

Investigation (IRS-CI), having been duly sworn, state as follows:

2.      I am a Special Agent (SA) with IRS-CI and am currently assigned to the Phoenix

Field Office, Albuquerque New Mexico Post of Duty.  I have been a Special Agent with IRS-CI

since February 2008.  I received my formal law enforcement training at the Federal Law

Enforcement Training Center, where I graduated from the Special Agent Basic Training and

Criminal Investigative Training Program.  During my training, I studied a wide variety of law

enforcement tools, techniques and strategies, the fundamentals of criminal investigations, with a

focus on federal tax violations, as well as other federal offenses including but not limited to

money laundering.

3.      The information set forth in this affidavit was derived from my own investigation

and/or communicated to me by agent(s) with the United States Department of Education, Office

of Inspector General (ED OIG), the Federal Bureau of Investigation (FBI), and other law

enforcement agencies, and from records and documents that I, and others, have reviewed.  I have

not included every fact known to me concerning the investigation.  I have set forth only the facts

that I believe are necessary to demonstrate probable cause for the issuance of the requested search and seizure warrants.

     4.     I am familiar with the investigation of Sheryl Williams-Stapleton (Stapleton) and Joseph F. Johnson Jr. (Johnson), et al, involving allegation of violations of 18 U.S.C. § 666, Theft or bribery concerning programs receiving Federal funds, 18 U.S.C. § 1343, Wire Fraud, Title 18 U.S.C. § 1346, Honest Services Fraud, and 18 U.S.C. § 1956, Laundering of monetary instruments.

     5.     This affidavit is presented in support of an application for the issuance of a Search and Seizure Warrant to search the following digital devices, storage mediums and/or device images, hereinafter the "DEVICES." The items to be seized and searched were previously seized by New Mexico Attorney General Office (NMAGO) on July 27, 2021, and July 28, 2021, from Albuquerque Public Schools located at 6400 Uptown Blvd., Albuquerque, NM 87110 Suite 590 West, and the residence of Stapleton located at 4616 Crest Ave. SE, Albuquerque, NM 87108. The NMAGO provided the DEVICES to affiant pursuant to a subpoena. The DEVICES are currently being held in the IRS CI's evidence room located at 6200 Jefferson St. Albuquerque, NM 87109:

| Device # | Description |
|---|---|
| 1 | Eight thumb drives |
| 2 | Dell OptiPlex 9030 Tag #1F65R52 |
| 3 | Dell OptiPlex 5480 Tag#6SHTJD3 |
| 4 | Galaxy S7 (Model: SM-G935ABLK32, IMEI:357216071686860 ) |
| 5 | iPhone (IMEI:354437068374244, Model: A1524) |
| 6 | AT&T Cellphone |
| 7 | Dell Laptop (S/N: 2L6F162) |
| 8 | Dell Laptop (S/N: HT5WKX1) |
| 9 | Dell Laptop (Prod No: 686WKX1) |
| 10 | Dell Laptop (Model: P36G) labeled "Property of APS" |
| 11 | Dell OptiPlex 755 Tower (Service No. FSDX3G1) |
| 12 | Dell Laptop (S/N: 54WR2S1) |
| 13 | Dell Laptop (S/N: 7BJYPV2) labeled "Property of APS Schools 787898" |

| Device # | Description |
|---|---|
| 14 | Dell Laptop (S/N: F31F162) labeled "Property of APS 729153" |
| 15 | Tablet (Model T004, S/N 00160253-LE1600) |
| 16 | Dell Laptop (Model: PP18L Service No: 8DXR3H1) |
| 17 | Dell Laptop (Model: PP15L Service No: FDLHM81) |
| 18 | Dell Laptop (Model PP13S, Service No: FZDCTL1) |
| 19 | Dell Laptop (Model: PP05L, Service No: DYLX641) |
| 20 | Blu Phone |
| 21 | Samsung Galaxy S7 (IMEI :359470073570030) |
| 22 | Dell Laptop (S/N: 87P6TQ2) labeled "State of New Mexico Legislative Council Service LEG19L87P6" |
| 23 | Dell All-in-one (S/N: BRFNCP2) |
| 24 | Dell OptiPlex 360 tower (S/N: 69NZ3J1) |

6.       As detailed below, I have probable cause to believe that based upon the facts set forth in this affidavit that evidence, fruits, or contraband on each DEVICE that will be searched/seized, are evidence of the fraud perpetrated by Stapleton and Johnson.

## OVERVIEW OF THE CARL D. PERKINS VOCATIONAL AND CAREER TECHNICAL EDUCATION ACT

7.       The Carl D. Perkins Vocational and Technical Education Act (Perkins), 20 U.S.C. § 2301 (34 CFR 674), provides federal funding for state and district Career Technical Education (CTE) programs.  CTE programs provide technical education for secondary and postsecondary education students.

8.       Perkins funds are a federal grant, and as such, regulated by the Federal Acquisition Regulations (FAR) and the Code of Federal Regulations (CFR).  Various sections of the FAR and CFR, including 2 C.F.R. § 200.318, contain regulations relevant to this affidavit, such as conflict of interest, anti-kickback, and bribery provisions.

9.       The United States Department of Education (ED) provides Perkins funding to the New Mexico Public Education Department (PED).  The PED then allocates the funds to the various school districts in NM based on district applications for CTE funding.  On an annual basis, school districts compile their CTE funding requests and then apply to PED for program

funding.  Albuquerque Public Schools (APS) was the largest beneficiary of CTE funds in the state of New Mexico during the period covered in this affidavit.

10.     Stapleton was the Director of the Perkins project and the CTE Coordinator for APS during the timeframe covered in this affidavit.  Stapleton was a State Representative for District 19 in Bernalillo County from 1995 until 2021, and served on various committees including the Education Committee.

11.     The Perkins funds that PED directed to APS and then to the CTE programs at APS are subject to the FAR and CFR, which require contracting to be conducted at arm's length and prohibit kickbacks and bribes.

12.     Robotics Management Learning Systems LLC (RMLS) was a vendor for APS and provided a software program to APS for the CTE program called CyberQuest. RMLS was also to provide the professional development associated with CyberQuest to APS.

13.     Between at least 2013 and 2019, the ED via Perkins funding provided to the PED over $41,000,000 in CTE funding.  From those funds, the PED provided APS approximately $6,167,297.14 for CTE programs based on the following annual disbursements:

> 2013-2014- $975,341.00
> 2014-2015- $934,240.00
> 2015-2016- $1,069,920.54
> 2016-2017- $1,068,165.60
> 2017-2018- $1,052,895.00
> 2018-2019- $1,066,735.00
> Total- $6,167,297.14

14.     Your affiant has reviewed APS requests to PED for Perkins funding.  Two of the disclosures noted on the application are:

- Perkins funds will not be used to supplant program activities or services being funded with state and local funds.

- Funds will not be used to acquire equipment (including computer software) that results in direct financial benefit to any organization representing the interest of the purchasing entity or its employees or any affiliate of such organization.

## HOUSE BILL 91

15.     On December 18, 2018, House Bill 91 (HB91), which was sponsored by Stapleton and Dayan Hochman Vigil, was introduced.  HB 91 passed during the 2019 regular legislative session and became law when it was signed by the Governor on March 15, 2019.  The bill was for a seven-year CTE pilot project called NextGen and was to be administered by the PED.  The bill was to fund high quality CTE programs and monitor their effect on student outcomes and provided additional CTE funding that was separate from the Perkins Federal funding.  The Next Gen Funds were identified as State flow through grant funds by APS.

## OVERVIEW OF THE ALLEGED CRIME

### JOSEPH JOHNSON AND SHERYL WILLIAMS STAPLETON

16.     Johnson agreed to speak with FBI agents on July 28, 2021, and provided the following information:  He has known Stapleton for approximately 30-40 years, and they attended New Mexico State University (NMSU) together.  Their friendship predated her employment with APS and her election to the New Mexico House of Representatives.  One day, while talking with Stapleton, Johnson mentioned a software program developed at MIT that would help underperforming students understand and not be afraid of math.  Stapleton liked the idea and asked Johnson to show it to her.

17.     Johnson was asked if he had any financial relationships with Stapleton and he replied in the negative.  Johnson at one point responded when asked the question again, "there is nothing coming to her from our company, period."

18.     Johnson identified himself as the owner/director of Robotics Management Learning Systems, L.L.C.(RMLS).

## ROBOTICS MANAGEMENT LEARNING SYSTEMS L.L.C

19.      RMLS was organized in the District of Columbia on or about August 22, 2005. According to limited liability company documents, Johnson was the organizer of RMLS.  The address provided for Johnson was 2401 Calvert Street, NW, #106, Washington D.C.  RMLS had seven Articles of Incorporation annotated in the filing.  Articles 1 and 2 noted the name and duration of the Articles.  Article 3 identified the initial registered agent in the District of Columbia as Patricia Smith and provided an address of 1004 Southern Avenue SE, Washington D.C, 20032.  Articles 4 and 5 address organization and management.  Article 6 articulates the purpose of RMLS.  Article 7 identified Johnson as the sole organizer.  A Written Consent to Act as Registered Agent was included in the filing and was signed by Patricia A. Smith on or about August 22, 2005.

20.      On September 9, 2021, RMLS filed a Certificate of Registration with the New Mexico Secretary of State; long after it started to do business with APS.  The email address for RMLS was identified as jjohn99403@aol.com; phone number 703-786-9475.  Johnson is identified as the person that managed RMLS.

21.      APS records indicate RMLS was paid $5,360,030 between April 5, 2006, and June 30, 2021.  APS used the following funding methods per year to pay RMLS, of which a total of approximately 62% was from Carl Perkins Federal Grant funds:

| Calendar Year | Carl Perkins Federal Funds | House Bill 91 Next Gen Funds | House Bill 33 Public School Building Act | Senate Bill 9 Public Schools Capital Improvements Act | State Special Capital Outlay | Operations | Total Paid to RMLS |
|---|---|---|---|---|---|---|---|
| 2006 | | | | | | $209,980.00 | $209,980.00 |
| 2007 | | | | | | $280,000.00 | $280,000.00 |
| 2008 | $220,000.00 | | $160,000.00 | | | | $380,000.00 |
| 2009 | $200,000.00 | | $160,000.00 | | | | $360,000.00 |
| 2010 | $40,000.00 | | $280,000.00 | | | | $320,000.00 |
| 2011 | $103,500.00 | | | $120,000.00 | | | $223,500.00 |
| 2012 | $175,000.00 | | | $120,000.00 | | | $295,000.00 |
| 2013 | $175,500.00 | | | $160,000.00 | | | $335,500.00 |
| 2014 | $330,000.00 | | | $120,000.00 | | | $450,000.00 |
| 2015 | $348,000.00 | | | | | | $348,000.00 |
| 2016 | $308,000.00 | | | $80,000.00 | | | $388,000.00 |
| 2017 | $308,000.00 | | | $80,000.00 | | | $388,000.00 |
| 2018 | $348,000.00 | | | $40,000.00 | | | $388,000.00 |
| 2019 | $266,950.00 | | | | | | $266,950.00 |
| 2020 | $329,500.00 | $85,500.00 | | | $145,000.00 | | $560,000.00 |
| 2021 | $144,600.00 | $22,500.00 | | | | | $167,100.00 |
| **Total Funds Paid to RMLS per Funding** | **$3,297,050.00** | **$108,000.00** | **$600,000.00** | **$720,000.00** | **$145,000.00** | **$489,980.00** | **$5,360,030.00** |

**Summary of RMLS payments from APS per funding Source per Calendar Year**

22.     Stapleton, as the Director of CTE for APS, had the discretion to approve and disapprove APS teachers' requests for Carl Perkins funds or their requests for classroom equipment, supplies or needs.

### EXEMPTION FROM THE NEW MEXICO STATE PROCUREMENT CODE

23.     Prior to APS issuing a purchase order (PO) to RMLS, the CTE department had to enter a requisition which Stapleton and others had to approve prior to APS procurement issuing a PO. The requisition indicated a need for the good(s) or service(s).  APS procurement determined the purchasing method.

24.     Since at least 2014 through 2018, RMLS provided the CyberQuest software license(s) and professional development training to APS via an exemption from the NM procurement code or through a sole source contract.

25.     The exemption from procurement was 13-1-98E, which stated, "Purchase of Books, periodicals and training materials in printed or electronic format from the publisher's or copyright holders thereof".

26.     RMLS allegedly received a patent for CyberQuest in 2009, and a certificate with the seal of copyright in 2015, after the exemption from procurement was used to purchase CyberQuest from RMLS.  To date, a patent for CyberQuest has not been located but your affiant has been able to confirm the seal of copyright that occurred on or about February 27, 2015.

27.     The following POs have been identified as utilizing the exemption from the NM Procurement Code 13-1-98E and total $668,000 worth of payments to RMLS from APS.

| Summary of APS Purchase orders and Corresponding RMLS Invoices Indentified as purchased via Procurement Exemption 13-1-98E | | | | | | | |
|---|---|---|---|---|---|---|---|
| **APS Purchasing Method** | **PO #** | **Funding** | **Invoice #** | **Invoice date** | **Check Date** | **Trans #** | **Tran Pmt Amount** |
| Exemption from Proc 13-1-98E | 3008248 | Carl Perkins | APSAHS3329 | 10/9/2014 | 10/31/2014 | 789798 | $40,000.00 |
| Exemption from Proc 13-1-98E | 3008249 | Carl Perkins | APSWMHS3330 | 10/9/2014 | 10/31/2014 | 789798 | $40,000.00 |
| Exemption from Proc 13-1-98E | 3008665 | Senate Bill 9-Public Schools Capital Improvement Act | APSHHS3331 | 10/19/2014 | 11/14/2014 | 791044 | $40,000.00 |
| Exemption from Proc 13-1-98E | 3008666 | Senate Bill 9-Public Schools Capital Improvement Act | APSRGHS3332 | 10/19/2014 | 11/14/2014 | 791044 | $40,000.00 |
| Exemption from Proc 13-1-98E | 3018477 | Carl Perkins | APSEHS4755 | 3/17/2015 | 3/27/2015 | 801932 | $40,000.00 |
| Exemption from Proc 13-1-98E | 3020606 | Carl Perkins | APSCIB10155 | 4/3/2015 | 4/17/2015 | 803796 | $40,000.00 |
| Exemption from Proc 13-1-98E | 3022983 | Carl Perkins | APSVAL4767 | 5/2/2015 | 5/20/2015 | 807215 | $40,000.00 |
| Exemption from Proc 13-1-98E | 3024761 | Carl Perkins | APSATHSS4769 | 5/19/2015 | 5/27/2015 | 807821 | $40,000.00 |
| Exemption from Proc 13-1-98E | 151610042 | Carl Perkins | APSWM6058 | 11/4/2015 | 11/6/2015 | 821137 | $40,000.00 |
| Exemption from Proc 13-1-98E | 151611538 | Carl Perkins | APSWM6073 | 12/8/2015 | 12/16/2015 | 824522 | $40,000.00 |
| Exemption from Proc 13-1-98E | 151618296 | Senate Bill 9-Public Schools Capital Improvement Act | APSRGHS5195 | 1/19/2016 | 2/12/2016 | 828725 | $40,000.00 |
| Exemption from Proc 13-1-98E | 151618297 | Senate Bill 9-Public Schools Capital Improvement Act | APSHHS5194 | 1/19/2016 | 2/12/2016 | 828725 | $40,000.00 |
| Exemption from Proc 13-1-98E | 151622291 | Carl Perkins | APSHHS5204 | 3/7/2016 | 3/30/2016 | 832680 | $40,000.00 |
| Exemption from Proc 13-1-98E | 151622421 | Carl Perkins | APSVVHS5208 | 3/10/2016 | 4/1/2016 | 832953 | $40,000.00 |
| Exemption from Proc 13-1-98E | 151623633 | Carl Perkins | APSATHSS5211 | 3/17/2016 | 4/8/2016 | 833497 | $40,000.00 |
| Exemption from Proc 13-1-98E | 151623652 | Carl Perkins | APSVAL5210 | 3/17/2016 | 4/8/2016 | 833497 | $40,000.00 |
| Exemption from Proc 13-1-98E | 151627555 | Carl Perkins | APSSUMTRAINING1535 | 6/14/2016 | 6/22/2016 | 841009 | $28,000.00 |
| | | | **Total Payments to RMLS from APS Identified as Exemption from Proc. 13-1-98E** | | | | **$668,000.00** |

28.     According to the APS sole source/ emergency procurement rules, a sole source purchase can be made if there is no competition. Sole source purchases are made in accordance with 13-1-126 NMSA 1978, sole source procurement. According to the statute, "A contract may be awarded without competitive sealed bids or competitive sealed proposals regardless of the estimated cost when the state purchasing agent or a central purchasing office makes a determination, after conducting a good-faith review of available sources and consulting the using

agency, that there is only one source for the required service, construction, or item of tangible personal property…"

29.      A Sole Source Justification Request Form dated October 19, 2016, was reviewed. The requestor was "Sheryl Williams" for the CTE Department.  The vendor requested was RMLS.  The quantity was noted as "TBD" and the term was to expire on June 30, 2020. Stapleton signed the Sole Source Justification Form.

30.      According to the Procurement Sole Source Written Determination form, since the sole source procurement was being procured with Federal funds, the sole source procurement did not have to be posted on the APS website for 30 days.

31.      A second Sole Source Justification Request Form, # 2018-044, was reviewed. The requestor was "Sheryl Williams" for the CTE Department.  The vendor requested was RMLS.  The quantity was noted as "TBD" and the term was to expire on June 30, 2020. Stapleton signed this Sole Source Justification Form as well.

32.      On or about December 4, 2017, a sole source/emergency procurement requirement was posted to the APS procurement website.  The description of the product or service was "Renewal Web Based Educational Curriculum: Math/Science Integration Software for Career Tech Ed Classes."  The Department was noted as CTE and the supplier's name was RMLS.  The quantity was "TBD".

33.      From October 2016 through May 2018, RMLS received $828,000 from APS over a set of 21 purchase orders procured via a sole source contract.

## REQUEST FOR PROPOSAL #19-032 RMS

34.      On or about December 14, 2018, APS issued a Request for Proposal (RFP) #19-032 RMS that was seeking "a Contractor to provide the following professional services, that

support the development and integration of mathematics common core standards into District curriculum content in CTE courses…"

35.     APS RFP#19-032 RMS includes Terms and Conditions, including number three, "PROCUREMENT CODE; The Procurement Code sections 13-1-28 through 13-1-199 NMSA 1978 states the following:  Imposes civil and misdemeanor criminal penalties for its violation.  In addition, the New Mexico criminal statues impose felony penalties for bribes, gratuities, and kickbacks."

36.     Term number 11 of APS RFP # 19-032 RMS reads, "CONFLICT OF INTEREST:  By submitting a proposal, the proposer certifies that no relationship exists between the proposer and the District that interferes with fair competition or is a conflict of interest; and no relationship exists between such proposer and another person or firm that constitutes a conflict of interest that is adverse to the District."

37.     On or about January 24, 2019, RMLS submitted a response to the RFP# 19-032 RMS.  Johnson, the president of RMLS, was the person identified as being authorized to contractually obligate RMLS and to negotiate the contract on behalf of RMLS.  Johnson's email address is identified as jjohn99403@aol.com.  The person identified to be contacted for clarifications was Randolph Williams. Jr., president and CEO of Tritech Enterprises. William's email address is identified as rwilliams@tritechenterprise.com.

38.     There is a representation by Johnson, or what appears to be a cut and pasted signature, that "no contributions in the aggregate total over two hundred fifty dollars ($250) were made to an applicable public official by me, a family member or representative."  It is dated January 23, 2019, and identifies Johnson as the president of RMLS.

39.     The next section of the APS solicitation is titled 'Conflict of Interest and Debarment/Suspension Certification Form'.  Johnson acknowledged that the signature was cut and pasted but confirmed that the signature was his.

40.     In the conflict-of-interest certification, Johnson did not identify any APS employee with a direct or indirect financial interest in RMLS.

### APS Agreement # 15278

41.     RMLS was awarded the RFP resulting in APS Agreement for CTE Mathematics Web Based Learning System Agreement # 15278 (The Agreement).  On June 4, 2019, the Agreement was executed, as that is the date APS Senior Buyer Rebecca Simenson and Johnson signed the agreement.

42.     Article 3 of the Agreement states the total compensation shall not exceed $353,800 and is based upon fixed prices for each Deliverable, per the Scope of Work.

43.     Article 4 of the Agreement States Acceptance and states upon completion of agreed upon deliverables set forth in the Scope of Work. Contractor shall submit a payment invoice with the Deliverable, or description of the Deliverable, to APS.

44.     Article 12 identifies the Contractor Personnel, in which Johnson is the only person identified, and identified his email address as jjohn99403@aol.com.

45.     Article 22 is a representation that the contractor has no conflicts of interest and is following state regulations regarding conflicts of interest in public contracting.

46.     In order for payments to be made to RMLS against the Agreement a requestion needed to be entered by the CTE Department and approved by Stapleton and others. Upon approval the purchasing department would enter a PO and a vendor invoice would be billed against the draw down PO upon the completion of services

47.    PO #181921249 was the first PO identified for the Agreement and is as follows:



48.    On June 11, 2019, approximately seven days after Johnson signed the Agreement, APS received RMLS invoice # APSCTE7309 for $266,950, the exact amount as the PO (and approximately 75% of the total not to exceed amount of the Agreement).  The RMLS invoice predated the APS Purchase order.  Per the scope of work (SOW) for the Agreement, software code changes and customization were to be billed at $150/hr.  Item one of the invoice billed for 720 hours, but there was not 720 hours of work completed between the effective date of the

Agreement and RMLS invoice #APSCTE3709 (as there are only 168 hours in 7 days, if working

24 hours straight).  See invoice below:



49.    According to APS Accounts Payable, a department within APS, to effectuate a

payment the CTE department submits a vendor's invoice for payment.  CTE has to certify

services were rendered and that it is okay to pay the invoice.  Accounts Payable relies on this

certification when paying an invoice; without CTE telling Accounts Payable, there is no way for

Accounts Payable to know if the vendor performed the services.  RMLS invoice APSCTE7309

was initialed "ok to pay" by CTE employee Abigail Manzanares.

50.     Manzanares was interviewed and stated she was directed by Stapleton as to what invoices were okay to pay and what requisitions needed to be entered.  Manzanares had much respect for Stapleton and held her up on a pedestal.  Manzanares did not question Stapleton.

51.     On or about April 17, 2020, the Agreement was amended, wherein APS requested continuation of professional services.  The term of the agreement was from April 20, 2020, to April 19, 2021; all other provisions of the Agreement remained the same.  On or about July 21, 2021, the Agreement was amended again, wherein Deliverable #3 Professional Development was decreased by $72,000 and Deliverable #4 software customization was increased by $72,000. .

52.     Your affiant completed a reconciliation of the RMLS invoices per deliverable(s) to the initial Agreement and subsequent amendments and found that RMLS overbilled APS at least $282,850 for the deliverables outlined in the initial Agreement and subsequent amendments[1].

### RMLS Bank of America Account 7363

53.     Bank of America account ending 7636 is held in the name of RMLS and was opened on or about July 24, 2007.  The signature card identifies Johnson as the member/manager, and he is the sole signer on the account.

54.     Between April 1, 2013, and April 30, 2021, the majority of the deposits into RMLS account ending in 7636 came from APS.  The University of New Mexico was the second

---

[1] The second amendment to the Agreement was signed on July 21, 2021, by Johnson only. It states, "This amendment is binding upon both signatures, and insures the benefit, of the parties to this agreement". APS did not sign the amendment.   No POs appear to be issued after July 21, 2021. The NMAGO search warrant was executed on July 27, 2021, and July 28, 2021, approximately 6 days after the second amendment was signed by Johnson.  Professional development appears to have $18,300 remaining via the contract and 1st amendment after reconciling invoices.

largest source of deposits.  Deposits from APS totaled $3,044,450 and deposits from UNM

totaled approximately $123,214.

      55.     Between April 2013 and July 2021, RMLS received the following amounts from

APS via the corresponding number of deposits into account ending 7636:

        2013- $295,500 via 7 deposits
        2014- $410,000 via 8 deposits
        2015- $348,000 via 7 deposits
        2016- $428,000 via 8 deposits
        2017- $348,000 via 6 deposits
        2018- $388,000 via 7 deposits
        2019- $266,950 via 1 deposit
        2020- $560,000 via 8 deposits
        2021-$167,100 via 4 deposits
        Total- $3,211,550 via 56 deposits

      56.     In addition to the above confirmed deposits, APS identified one additional check

written to RMLS that total $40,000.  This check has not yet been confirmed as a deposit into

RMLS account ending 7636.

      57.     Checks from APS were made payable to RMLS and were sent to Post Office Box

(PO Box) 9323, Albuquerque, New Mexico.

      58.     When asked why RMLS checks were sent to a PO Box in Albuquerque instead of

Johnson's office in either Washington DC or Virginia, Johnson stated he used to have a couple

of employees who worked at an office at the fairgrounds in Albuquerque.  They would retrieve

checks and deposit them.  Johnson later closed the office but continued having individuals

retrieve the checks for deposit in Albuquerque.  According to Johnson, Stapleton also retrieved

checks from the PO Box and deposited them in the RMLS account.

      59.     As an example, check number 903715 was dated June 14, 2019, and was mailed

by APS to the RMLS Post Office Box.  The check was deposited in the RMLS account ending

7636 on June 18, 2019, at a Bank of America in Albuquerque.

60.     According to Johnson, RMLS is his business.  Stapleton is not an employee or in any way affiliated with the business.  According to Johnson, neither Johnson nor RMLS are affiliated with any of Stapleton's businesses or enterprises.

61.     Between April 1, 2013, and July 31, 2021, RMLS account 7636 dispersed a total of $1,079,856.54 to the following Stapleton-controlled entities in the following amount per calendar year:

| Summary of Deposits into Stapleton Entities For the Period April 1, 2013 and July 31, 2021 | | | | | |
|---|---|---|---|---|---|
| Calender Year | Ujima Foundation/ Charlie Morrisey 7924 | Ujima Foundation 3724 | S. Williams & Associates 0857 | Taste of Caribbean 3753 | Total |
| 2013 | $ 74,920.00 | | | | $ 74,920.00 |
| 2014 | $ 77,355.00 | | $ 22,500.00 | | $ 99,855.00 |
| 2015 | $ 106,535.00 | | $ 107,735.90 | $ 16,485.68 | $ 230,756.58 |
| 2016 | $ 38,950.00 | $ 5,500.00 | $ 55,795.00 | $ 95,050.00 | $ 195,295.00 |
| 2017 | $ 57,565.20 | | $ 47,561.20 | $ 98,800.60 | $ 203,927.00 |
| 2018 | $ 58,835.66 | | $ 53,180.10 | $ 102,787.20 | $ 214,802.96 |
| 2019 | $ 3,500.00 | | | | $ 3,500.00 |
| 2020 | | $ 48,800.00 | | | $ 48,800.00 |
| 2021 | | $ 8,000.00 | | | $ 8,000.00 |
| Totals | $ 417,660.86 | $ 62,300.00 | $ 286,772.20 | $ 313,123.48 | $ 1,079,856.54 |

62.     In additional to the above entities receiving funds from RMLS, Stapleton's home was remodeled in 2014 and the contractor was paid approximately $42,289 from RMLS account ending 7636.  Between 2013 and 2019, approximately $30,000 was paid to the property manager of Stapleton and an additional $360 was paid to Stapleton's nephew David Hendrickson; whom she raised from childhood.

## ROBOTICS MANAGEMENT LEARNING SOLUTIONS AND TASTE OF THE CARIBBEAN

63.     Taste of the Caribbean (TOC)/El Sabor De Caribe LLC was incorporated in New Mexico on or about November 1, 2015, as a domestic limited liability company.  The organizers

are Sheryl Williams Stapleton and Veronica Williams.  The registered agent is identified as

Stapleton and references her physical address as 4616 Crest SE, Albuquerque, NM 87108,

Stapleton's known physical address.

64.     TOC's principal place of business was located at 2720 Central Avenue SE, Suite

A in Albuquerque, New Mexico.

65.     According to their website, TOC "has been with Albuquerque for eleven years

prior to their permanent location in the UNM area. Originally cooking at the Albuquerque

Pavilion at Expo New Mexico on the State Fairgrounds…".

66.     Bank of America account ending 3753 was opened for TOC on or about October

23, 2015, with a $4,000 ATM deposit.  The signature card classifies TOC as a "single member

sole proprietor" limited liability company.  Stapleton is identified as the owner and the sole

signature authority.

67.     When interviewed, Johnson claimed to have no financial interest in TOC.

According to Johnson he was neither a shareholder nor partner, nor had he ever loaned any

money to the enterprise.

68.     According to records reviewed, between 2015 and 2018, TOC received the

following amounts from RMLS via the corresponding number of deposits into account number

ending 3753:

> 2015- $16,485.68 via 2 deposits
> 2016- $95,050.00 via 17 deposits
> 2017- $98,800.60 via 19 deposits
> 2018- $102,787.20 via 18 deposits
> Total $313,123.48 via 56 deposits

69.     From on or about October 23, 2015, to April 30, 2021, TOC account ending 3753

had a total of $658,848.45 deposited into the account.  The $313,123.48 in RMLS deposits were

the largest source of deposits from a single source and accounted for approximately 47.5% of the deposits.  In my training and experience, subjects often comingle legitimate income with illicit proceeds to give the illicit proceeds the appearance of legitimacy.

70.     When interviewed, Johnson informed the FBI that over the years he had sent Stapleton approximately three or four blank checks per summer in order to pay for a summer program RMLS ran for UNM.  The total would have been less than $2,000 for all the teachers. During the interview, and unprompted, Johnson called Patricia Smith[2] (Smith) to verify the information.  Smith, unaware that agents were interviewing Johnson, replied she never sent over 15 checks, the last being in 2020.  Smith stated that most of the time she signed them but may not have signed checks from 2020.  Stapleton did not send receipts back.

71.     Johnson was asked if Stapleton had a RMLS checkbook, which Johnson denied.

72.     All 56 deposits noted above were via RMLS checks paid to the order of TOC.

73.     In reviewing the 56 deposited checks, your affiant noted signature discrepancies in the checks.  When opening the RMLS Bank of America account, Johnson signed his signature three times, noted below:



---

[2] Patricia Smith was an independent contractor to RMLS, and served as its registered agent.

74.     Based on a review of the 56 RMLS checks deposited in the TOC account, a few signature variations are noted:



75.     All RMLS checks deposited in the TOC account were deposited in New Mexico. RMLS checks deposited in Virginia, where Johnson resides, were reviewed and the signatures appear different.



76.     Oftentimes, the deposit of an RMLS check to the TOC account would occur the same day as, or within a few days of APS making a payment to RMLS.

77.     The memo line for the RMLS checks deposited in the TOC account state things such as expenses, lease payments, fees, insurance, and taxes.

## ROBOTICS MANAGEMENT LEARNING SOLUTIONS AND
## S. WILLIAMS AND ASSOCIATES

78.     The New Mexico Secretary of State (NMSOS) online business portal was queried for S Williams and Associates and no record was found.  Internet queries for S Williams and Associates (SWA) and related derivations did not locate anything consistent with Stapleton or an entity under her control.

79.     When interviewed, Johnson claimed he had no business interest or financial relationship with SWA, an entity he was aware of and believed Stapleton used as a consulting business.  Neither RMLS nor any entity under Johnson's control is a client of SWA.  Johnson was unaware of any of SWA's clients.

80.     Bank of America account ending 0857 was opened on or about March 13, 2008. The original signature card identifies Stapleton as the sole proprietor/owner and indicated an SSN as the tax identification number of SWA.  Additional database checks revealed what was indicated as an SSN was the Employer Identification Number (EIN) for SWA.  On or about March 23, 2009, Veronica Williams was added as a signer with Stapleton, who remained the sole proprietor/owner.  The balance on April 1, 2013. was $35.10.

81.     According to records reviewed, between 2014 and 2018, SWA received the following amounts from RMLS via the corresponding number of deposits:

    2014- $22,500.00 via 6 deposits
    2015- $107,735.90 via 18 deposits
    2016- $55,795.00 via 14 deposits
    2017- $47,561.20 via 10 deposits
    2018- $53,180.10 via 12 deposits
    Total $286,772.20 via 60 deposits

82.     All 60 deposits were via RMLS checks paid to the order of SWA and deposited into the account ending 0857.

83.     In reviewing the checks, your affiant identified the same signature pattern as identified on the TOC checks:





84.     Several of the RMLS checks deposited in the SWA account noted in the memo line expenses, contract services, fees.

85.     Between about April 1, 2013, to April 30, 2021, SWA account ending 0857 had deposits of $315,802.57, of which RMLS was the source of $286,772.20, making RMLS the largest depositor, accounting for approximately 90.8% of the SWA deposits.  In my training and experience, subjects often deposit illicit money into a business to conceal or disguise the true nature of the proceeds.

### ROBOTICS MANAGEMENT LEARNING SOLUTIONS AND
### THE UJIMA FOUNDATION/CHARLIE MORRISEY

86.     The Ujima Foundation (UF) was incorporated in New Mexico on or about November 8, 1996, as a domestic nonprofit corporation.  According to a review of the NMSOS Corporations and Business Services website, the UF is still active and in good standing.

87.     Article three of UF Articles of Incorporation states the business purpose of UF is "To address educational, social, and economical and health issues facing people of color in New Mexico. Through community interaction and collaboration. The Foundation will provide gang intervention, after school and before school educational services, drug abuse awareness, parental counseling, AIDS education and intervention for women and teens."

88.     On February 20, 1997, a certificate of amendment for UF was filed.  It amended Article three of UF Articles of Incorporation to include the following: "This organization is organized exclusively for charitable, religious, education or scientific purposes within the meaning of section 501(C) (3) of the Internal Revenue Code. No part of the net earnings of the organization shall inure to the benefit of, or be distributable to its members, trustees, officers, or other private person, except that the organization shall be authorized and empowered to pay reasonable compensation for services rendered and to make payments and distributions in furtherance of the purpose set forth."

89.      Annual reports were filed electronically with NMSOS, for UF and identified the email address Sheryl.stapleton@yahoo.com and the principal place of business or mailing address as 4616 Crest SE, Albuquerque, NM 87108, Stapleton's residence.  Each of the UF annual reports identified Stapleton as the UF Registered Agent.

90.     The following individuals were identified as the officers and/or the directors of

UF on the electronically filed annual reports filed with the NMSOS.

| | | | | | | Summary of Annual Reports for Ujima Foundation | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Officers/Directors | | | | | |
| Ref # | Annual Fiscal Year End | Transaction Type | Filing Date | President | Vice President | Secretary | Treasurer | Director | Director | Director |
| 1 | 06/30/2016 | Annual Report | 03/02/2017 | Joseph F. Johnson | Patricia Smith | Sheryl Wiliams Stapleton | Sheryl Wiliams Stapleton | Diana Hyliger | Michael Schyler | Rev. N.D Smith |
| 2 | 06/30/2017 | Annual Report | 11/14/2017 | Joseph F. Johnson | Patricia Smith | Sheryl Wiliams Stapleton | Sheryl Wiliams Stapleton | Diana Hyliger | Michael Schyler | Rev. N.D Smith |
| 3 | 06/30/2018 | Annual Report | 11/19/2018 | Joseph F. Johnson | Patricia Smith | Sheryl Wiliams Stapleton | Sheryl Wiliams Stapleton | Diana Hyliger | Michael Schyler | Rev. N.D Smith |
| 4 | 06/30/2019 | Annual Report | 11/15/2019 | Joseph F. Johnson | Patricia Smith | Sheryl Wiliams Stapleton | Sheryl Wiliams Stapleton | Diana Hyliger | Michael Schyler | Rev. N.D Smith |
| 5 | 06/30/2020 | Annual Report | 11/18/2020 | Joseph F. Johnson | Patricia Smith | Sheryl Wiliams Stapleton | Sheryl Wiliams Stapleton | Diana Hyliger | Michael Schyler | Rev. N.D Smith |

91.     Electronically filed, UF Forms 990-EZ, Short Form Return of Organization

Exempt from Income Tax, for the following fiscal years were all signed electronically by

Stapleton under the following penalty of perjury, and she was identified as the person in care of

UF books on each of the following UF Forms 990-EZ forms:



| | | | | | | | Summary of Ujima Foundation, Forms 990-EZ, Short Form Return of Organization Exempt from Income Tax Per Fiscal Year | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | Signer Names, Signature Dates and Organization's books and records in care of | | | | |
| Ref # | Fiscal Year | How filed | Signer on the return | Date of Signature | Officer Email Address | Address on Return | Organization's books are in care of | Phone number | |
| 1 | 07/01/2014 to 06/30/2015 | Electronic | Sheryl Wiliams-Stapleton | 12/22/2015 | williamssm@aps.edu | PO Box 25385 Albuquerque, NM 87125 | Sheryl Williams-Stapleton | 505-265-6089 | |
| 2 | 07/01/2015 to 06/30/2016 | Electronic | Sheryl Wiliams-Stapleton | 05/15/2017 | williamssm@aps.edu | PO Box 25385 Albuquerque, NM 87125 | Sheryl Williams-Stapleton | 505-265-6089 | |
| 3 | 07/01/2016 to 06/30/2017 | Electronic | Sheryl Wiliams-Stapleton | 05/12/2018 | WILLIAMS_SM@APS.EDU | PO Box 25385 Albuquerque, NM 87125 | Sheryl Williams-Stapleton | 505-265-6089 | |
| 4 | 07/01/2017 to 06/30/2018 | Electronic | Sheryl Wiliams-Stapleton | 01/18/2020 | WILLIAMS_SM@APS.EDU | PO Box 25385 Albuquerque, NM 87125 | Sheryl Williams-Stapleton | 505-265-6089 | |
| 5 | 07/01/2018 to 06/30/2019 | Electronic | Sheryl Wiliams-Stapleton | 01/05/2021 | WILLIAMS_SM@APS.EDU | PO Box 25385 Albuquerque, NM 87125 | Sheryl Williams-Stapleton | 505-265-6089 | |
| 6 | 07/01/2019 to 06/30/2020 | Electronic | Sheryl Wiliams-Stapleton | 01/06/2021 | WILLIAMS_SM@APS.EDU | PO Box 25385 Albuquerque, NM 87125 | Sheryl Williams-Stapleton | 505-265-6089 | |

nonexempt charitable trusts must attach a completed Schedule A   · · · · · · ►   ☑ Yes ☐ No

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge.

Sign Here

****** 2015-12-22
Signature of officer    Date

SHERYL WILLIAMS- STAPLETON  DIRECTOR
Type or print name and title

92.     The UF Forms 990-EZ identified two of the three directors as different

individuals than the UF annual reports filed with the NMSOS. Below is the identified officers,

directors, trustees and key employees on the electronically filed UF Forms 990-EZ, per fiscal

year.

| | | Officers/Directors | | | | |
|---|---|---|---|---|---|---|
| Ref # | Fiscal Year | President | Vice President | Director | Director | Director |
| 1 | 07/01/2014 to 06/30/2015 | Joe Johnson | Pat Smith | Sheryl Williams-Stapleton | ND Smith | Lanthia Gillispie |
| 2 | 07/01/2015 to 06/30/2016 | Joe Johnson | Pat Smith | Sheryl Williams-Stapleton | ND Smith | Lanthia Gillispie |
| 3 | 07/01/2016 to 06/30/2017 | Joe Johnson | Pat Smith | Sheryl Williams-Stapleton | ND SMith | Lanthia Gillispie |
| 4 | 07/01/2017 to 06/30/2018 | Joe Johnson | Pat Smith | Sheryl Williams-Stapleton | ND Smith | Lanthia Gillispie |
| 5 | 07/01/2018to 06/30/2019 | Joe Johnson | Pat Smith | Sheryl Williams-Stapleton | ND Smith | Lanthia Gillispie |
| 6 | 07/01/2019 to 06/30/2020 | Joe Johnson | Pat Smith | Sheryl Williams-Stapleton | ND Smith | Lanthia Gillispie |
| | | | | | | |

Summary of Ujima Foundation List of Officers, Directors, Trustees and Key Employees per Form 990-EZ, Short Form Return of Organization Exempt from Income Tax Per Fiscal Year

93.     Rev. N.D Smith is Napoleon Darnell Smith (N.D. Smith).  N.D. Smith was interviewed, and he identified Stapleton as a friend of approximately 45 years.  They attended NMSU together.  N.D. Smith identified Johnson as a fraternity brother from NMSU.  N.D. Smith had never heard of UF and was never asked by Stapleton or Johnson to serve on the board of directors.  N.D. Smith stated he was never a director and was never asked to be a director of UF, he never attended a UF board meeting and never heard the name UF, prior to the interview.

94.     Lanthia Gillespie was interviewed and identified herself as Lanthia Miles; Gillespie was her ex-husband's name.  Miles did not know who was in charge of the UF and she did not know what the UF did.

95.     When shown the UF Forms 990-EZ Part 4, the list of officers, directors, trustees, and key employees, "Lanthia Gillispie" was listed as a "director" who averaged 2 hours per week for UF.  Miles stated she was not a director, board member, or participant in the UF.  Stapleton never brought up being a director or board member for UF to Miles.  Miles never had a discussion with Stapleton, Johnson, Pat Smith, or N.D. Smith regarding the UF.  Miles was shown the UF Forms 990-EZ for tax years 2009-2018.  Miles reiterated she had no knowledge of

being listed as a director and never held a discussion about being a director with Stapleton. Miles pointed out the "Gillispie" was spelled wrong on the form; it should have been Gillespie.

96.     On or about April 28, 2009, Stapleton opened a Bank of America account ending 7924 with the title UJIMA Foundation/Charlie Morrisey (UCM). The name of the corporation was UF. The tax ID used to open the Bank of America account for UF is identical to the tax ID reviewed in public Form 990-EZ filings of 85-0446320. The balance in the account on April 1, 2013, was $2,697.60.

97.     When interviewed, Johnson claimed he was aware of the UF and that it was a charity run by Stapleton that awarded scholarships. Johnson stated he made donations over the years which would have totaled approximately $10,000. Johnson claimed that was the extent of his knowledge of the entity. Johnson claimed to have no knowledge or involvement in the entity outside the donations. When asked if he was aware of over $400,000 in RMLS funds being moved into the UCM account ending 7924, Johnson claimed to have no knowledge and stated that he was not only unaware of it but did not and would not have approved it.

98.     The signature page for UCM account ending 7924, signed by Johnson and Stapleton, lists Johnson as the president of UF and Stapleton as its CEO:

99.     Between 2013 and 2019, UCM received the following amounts from RMLS via

the corresponding number of deposits, equating to 85% of the total deposits into the UCM

account ending 7924:

> 2013- $74,920.00 via 20 deposits
> 2014- $77,355.00 via 23 deposits
> 2015- $106,535.00 via 19 deposits
> 2016- $38,950.00 via 8 deposits
> 2017- $57,565.20 via 12 deposits
> 2018- $58,835.66 via 12 deposits
> 2019- $3,500.00 via 2 deposits
> Total $417,660.86 via 96 deposits

100.    Between April 1, 2013, and May 31, 2020, approximately $201,084 was

withdrawn from the UCM account ending 7924 at either ATMs or bank branches in cash.

101.    Between May 13, 2013, and March 14, 2018, UF paid Stapleton the following

checks made payable to variations of her name.  In my training and experience this is done to

conceal the true nature and or ownership of the checks.

| | | | | | Summary of Ujima Checks written from Account ending 7924 to Stapleton or an AKA of Stapleton | |
|---|---|---|---|---|---|---|
| Ref # | Check Written | Post Date | Check # | Check Amount | Payee | Memo | Signer of the Check |
| 1 | 05/13/2013 | 05/13/2013 | 1214 | $1,500.00 | Sheryl Williams | | Sheryl Williams Stapleton |
| 2 | 06/22/2013 | 06/24/2013 | 1129 | $1,500.00 | Sheryl Hendrickson | | Sheryl Williams Stapleton |
| 3 | 07/08/2013 | 07/09/2013 | 1132 | $3,720.00 | Sheryl Hendrick Williams | | Sheryl Williams Stapleton |
| 4 | 09/16/2013 | 09/18/2013 | 1136 | $800.00 | Sheryl Stapleton | | Sheryl Williams Stapleton |
| 5 | 11/21/2013 | 11/21/2013 | 1137 | $2,500.00 | Sheryl Williams | | Sheryl Williams Stapleton |
| 6 | 12/04/2013 | 12/04/2013 | 1139 | $1,500.00 | Sheryl Williams | | Sheryl Williams Stapleton |
| 7 | 01/07/2014 | 01/08/2014 | 1141 | $4,000.00 | Sheryl Williams | | Sheryl Williams Stapleton |
| 8 | 02/01/2014 | 02/03/2014 | 1142 | $1,000.00 | Sheryl Williams | | Sheryl Williams Stapleton |
| 9 | 03/17/2014 | 03/17/2014 | 1144 | $500.00 | Sheryl Williams | | Sheryl Williams Stapleton |
| 10 | 04/17/2014 | 04/17/2014 | 1145 | $800.00 | Sheryl Williams | | Sheryl Williams Stapleton |
| 11 | 05/01/2014 | 05/02/2014 | 1147 | $2,000.00 | Sheryl Williams | | Sheryl Williams Stapleton |
| 12 | 05/07/2014 | 05/07/2014 | 1148 | $500.00 | Sheryl Williams | | Sheryl Williams Stapleton |
| 13 | 05/14/2014 | 05/14/2014 | 1149 | $500.00 | Sheryl Williams | Expenses | Sheryl Williams Stapleton |
| 14 | 05/27/2014 | 05/27/2014 | 1150 | $800.00 | Sheryl Williams | Expenses | Sheryl Williams Stapleton |
| 15 | 06/16/2014 | 06/16/2014 | 1351 | $300.00 | Sheryl Stapleton | Van Expenses | Sheryl Williams Stapleton |
| 16 | 07/03/2014 | 07/03/2014 | 1358 | $1,700.00 | Sheryl Williams | | Sheryl Williams Stapleton |
| 17 | 07/15/2014 | 07/15/2014 | 1360 | $650.00 | Sheryl Williams | | Sheryl Williams Stapleton |
| 18 | 07/29/2014 | 07/29/2014 | 1364 | $800.00 | Sheryl Williams | | Sheryl Williams Stapleton |
| 19 | 08/27/2014 | 08/27/2014 | 1367 | $300.00 | Sheryl Williams | | Sheryl Williams Stapleton |
| 20 | 09/15/2014 | 09/15/2014 | 1370 | $1,000.00 | Sheryl Williams | | Sheryl Williams Stapleton |
| 21 | 10/11/2014 | 10/14/2014 | 1371 | $500.00 | Sheryl Williams | | Sheryl Williams Stapleton |
| 22 | 11/05/2014 | 11/06/2014 | 1372 | $2,000.00 | Sheryl Williams | | Sheryl Williams Stapleton |
| 23 | 11/25/2014 | 11/25/2014 | 1373 | $400.00 | Sheryl Williams | | Sheryl Williams Stapleton |
| 24 | 12/06/2014 | 12/08/2014 | 1225 | $1,500.00 | Sheryl Williams | | Sheryl Williams Stapleton |
| 25 | 12/16/2014 | 12/16/2014 | 1227 | $1,000.00 | Sheryl Williams | payroll | Sheryl Williams Stapleton |
| 26 | 12/19/2014 | 12/19/2014 | 1228 | $500.00 | Sheryl Williams | | Sheryl Williams Stapleton |
| 27 | 12/31/2014 | 12/31/2014 | 1233 | $600.00 | Sheryl Hendrickson | | Sheryl Williams Stapleton |
| 28 | 01/15/2015 | 01/15/2015 | 1229 | $800.00 | Sheryl Williams | | Sheryl Williams |
| 29 | 02/23/2015 | 02/23/2015 | 1232 | $2,500.00 | Sheryl Williams | contract services | Sheryl Williams Stapleton |
| 30 | 03/05/2015 | 03/05/2015 | 1235 | $500.00 | Sheryl Williams | Expenses | Sheryl Williams Stapleton |
| 31 | 03/09/2015 | 03/09/2015 | 1236 | $500.00 | Sheryl Williams | | Sheryl Williams Stapleton |
| 32 | 04/10/2015 | 04/10/2015 | 1237 | $500.00 | Sheryl Williams | Expenses | Sheryl Williams Stapleton |
| 33 | 06/02/2015 | 06/02/2015 | 1240 | $500.00 | Sheryl Williams | Expenses | Sheryl Williams Stapleton |
| 34 | 06/05/2015 | 06/05/2015 | 1242 | $500.00 | Sheryl Williams | | Sheryl Williams Stapleton |
| 35 | 07/04/2015 | 07/06/2015 | 1244 | $1,200.00 | Sheryl Williams | Expenses | Sheryl Williams Stapleton |
| 36 | 07/21/2015 | 07/21/2015 | 1247 | $1,500.00 | Sheryl Williams | | Sheryl Williams |
| 37 | 07/24/2015 | 07/24/2015 | 1245 | $800.00 | Sheryl Williams | | Sheryl Williams Stapleton |
| 38 | 08/01/2015 | 08/11/2015 | 1250 | $2,000.00 | Sheryl Williams | contract services | Sheryl Williams Stapleton |
| 39 | 09/14/2015 | 09/04/2015 | 1248 | $650.00 | Sheryl Williams | Expenses | Sheryl Williams Stapleton |
| 40 | 09/15/2015 | 09/15/2015 | 1255 | $800.00 | Sheryl Williams | | Sheryl Williams Stapleton |
| 41 | 10/07/2015 | 10/08/2015 | 1260 | $800.00 | Sheryl Williams | | Sheryl Williams |
| 42 | 10/15/2015 | 10/15/2015 | 1261 | $1,500.00 | Sheryl Williams | Expenses | Sheryl Williams |
| 43 | 10/29/2015 | 10/29/2015 | 1263 | $2,000.00 | Sheryl Williams | | Sheryl Williams |
| 44 | 12/15/2015 | 12/15/2015 | 1265 | $800.00 | Sheryl Williams Stapleton | | Sheryl Williams Stapleton |
| 45 | 12/22/2015 | 12/23/2015 | 1241 | $250.00 | Sheryl Stapleton | | Sheryl Williams Stapleton |
| 46 | 12/22/2015 | 12/23/2015 | 1246 | $500.00 | Sheryl Williams | | Sheryl Williams Stapleton |
| 47 | 03/13/2018 | 03/14/2018 | 1004 | $1,000.00 | Sheryl Williams | | Sheryl Williams Stapleton |
| | | | **Total** | **$52,470.00** | | | |

102.    On or about April 3, 2017, Stapleton purchased a 2017 Volvo XC60 vin number

YV440MDR9H2027406 from Corley's Albuquerque Lincoln Volvo for approximately

$46,611.40.  Stapleton made a $15,000 down payment, leaving a balance owed of approximately

$31,611.40.  On or about July 9, 2019, Stapleton received a default notice from Volvo Financial

Services for being in arrears $1,083.72.  On or about July 10, 2019, a payment of $1,083.72 was made from the UCM account ending 7924, bringing the Volvo account up to date.  As of approximately April 20, 2021, Stapleton had made approximately $31,611.40 in payments and had an outstanding balance of approximately $6,322.11.  Between 2017 and 2019, the UCM account ending 7924 was used to make 22 electronic payments for the Volvo totaling $13,803.36.  On approximately April 7, 2017, check number #1288 in the amount of $5,000 was written to "Corley's" with a memo stating "transportation" from the UCM account ending 7924.

103.    In addition to the cash withdrawals, checks and transfers went to pay for various Stapleton family purposes, including payments to a lawyer to defend a Stapleton family member in a criminal court case, and to the New Mexico State Fair for Stapleton's husband's concession stand fees.  The following summary describes payments made out of UCM account ending 7924 account that do not appear to correlate to the UF Articles of Incorporation Business Purpose, the annual UF reports filed with the NMSOS, or the Form 990 Organization exempt purpose, instead the funds appear to have gone to the benefit of Stapleton or family member.

| Payor/Payee | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Total | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| **Summary of Ujima Foundation/Charlie Morrisey Bank Account Ending 7924** **Disbursements Appearing to be for Stapleton's benefit** **For the time Period April 1, 2013 to May 18, 2021** | | | | | | | | | | |
| Checks Payable to Sheryl Williams Stapleton or AKA | $ 11,520.00 | $ 21,350.00 | $ 18,600.00 | | | $ 1,000.00 | | | $ 52,470.00 | |
| Transfer to Veronica Williams/ Sheryl Williams Stapleton to checking 2525 | | | | | $ 900.00 | | | | $ 900.00 | |
| Transfer to Clementine Hendrickson/ Sheryl Williams Stapleton checking 0930 | | | $ 6,200.00 | | | | | | $ 6,200.00 | |
| Volvo Financial Services | | | | | $ 4,214.88 | $ 6,382.32 | $ 3,206.16 | | $ 13,803.36 | Volvo |
| Law Offices of Clive Rivers | | | | $ 5,000.00 | $ 3,000.00 | | | | $ 8,000.00 | payments for Stap |
| NM State Fair/ NM Expo NM | | $ 5,382.00 | | | $ 5,000.00 | $ 318.00 | | | $ 10,700.00 | Nm State Fair |
| Transfer to Ujima Foundation checking 3724 | | $ 30,100.00 | | | $ 1,000.00 | | | $ 1,058.60 | $ (32,158.60) | Stapleton Entity |
| Transfer to Taste of Caribbean checking 3753/ Checks to TOC | | $ 4,000.00 | $ 57.23 | | | | | | $ (4,000.00) | Stapleton Entity |
| S Williams and Associates | | | $ 28.00 | | | | | | $ (57.23) | Stapleton Daughter |
| Veronica Williams | | $ 550.00 | | | | | | | $ 550.00 | Stapleton Daughter |
| National Conference of State Legislature | | $ 300.00 | | | | | | | $ 300.00 | Political organiza |
| McComas Sales Co Inc | | | $ 432.74 | | | | | | $ 432.74 | Restaurant Supply |
| National Restaurant Supply | | | $ 2,134.01 | | | | | | $ 2,134.01 | Restaurant Supply |
| Bank of Nevis | | | $ 1,776.00 | | | | | | $ 1,776.00 | Bank of Nevis |
| Smoke N Booze | | | | | $ 149.35 | | | | $ 149.35 | |
| **Total** | $ 11,520.00 | $ 22,200.00 | $ 68,624.75 | $ 5,085.23 | $ 14,264.23 | $ 7,700.32 | $ 3,206.16 | $ 1,058.60 | $ 61,199.63 | |

104.    Based on my training and experience, the RMLS payments to UCM/UF were done to give the appearance of legitimate donations to the charity and the majority of the money

was not being used for the purpose of the charity.  It appears as if UCM/UF was a mechanism for

Stapleton to conceal the true nature of the transactions and for her to profit from her CTE

position and Legislative position

## ROBOTICS MANAGEMENT LEARNING SOLUTIONS
## AND UJIMA FOUNDATION SECOND BANK ACCOUNT ENDING 3724

105.    On or about October 14, 2015, Stapleton opened Bank of America account ending

3724 in the name of UJIMA Foundation (UF).  Stapleton is the sole signer on this account and is

listed as the chairman of the non-profit corporation.  The EIN for UF is noted as 85-0446320

which is identical to that of UCM bank account ending 7924.  The account was initially opened

with a $100 deposit from the UCM account ending 7924 via an account transfer on or about

October 14, 2015.  On or about December 8, 2015, a teller transfer occurred whereby $30,000

was transferred from the UCM account ending 7924 to the UF account ending 3724.

106.    According to records reviewed, between 2016 and 2021, UF account ending 3724

received the following amounts from RMLS via the corresponding number of deposits:

> 2016- $5,500 via 1 deposit
> 2020- $48,800 via 7 deposits
> 2021- $8,000 via 1 deposit
> Total $62,300.00 via 9 deposits

107.    Between October 14, 2015, and March 21, 2021, $32,158.60 was transferred to

the UCM account ending 7924 from the UF accounting 3724:

> 10/14/2015- $100.00
> 12/8/2015- $30,000.00
> 3/13/2017- $1,000.00
> 5/18/2020- $1,058.60
> Total- $32,158.60

108.    In the time period covered in this affidavit, RMLS was paid approximately

$3,297,050.00 in Perkins funds, per APS records.  Despite being the owner/director of RMLS

and sole signer on the RMLS bank account, Johnson stated he was unaware that Stapleton

received money from any RMLS account.  During the time period covered, approximately

$1,079,856.54 was paid to accounts controlled by Stapleton from the RMLS account.

### ROBOTICS MANAGEMENT LEARNING SOLUTIONS AND
### TRITECH ENTERPRISE SYSTEMS, INC.

109.    Randolph Williams[3], chief operating officer (COO) and president of TriTech

Enterprises, LLC, herein after "TriTech," was interviewed and produced records related to

TriTech's business relationship with RMLS.

110.    TriTech is an information technology (IT) company that began in approximately

2002. The company contracts with the Federal government, states, and private companies.

111.    Randolph Williams met Andre Thompson (Thompson), an employee of RMLS, in

approximately 1997.  Thompson was Williams' next-door neighbor and knew Williams was in

IT.  Somewhere around 2005, Thompson asked Williams if TriTech could do some IT work for

RMLS.  Approximately five years ago, Thompson suffered a stroke, so he no longer works for

RMLS.

112.    Randolph Williams knew Thompson before he met Johnson, the owner, and chief

executive officer (CEO) of RMLS.  Contracts between RMLS and TriTech were mostly verbal.

RMLS typically did not write-up contracts.  The typical verbal agreements stated that RMLS

wants/needs this work done and included a schedule for timeframe of completion.  TriTech

invoiced RMLS for payment once TriTech services were complete.  Williams would sometimes

memorialize the agreements made with RMLS in a letter format.

113.    TriTech bid on three projects for RMLS and was awarded all three.  One of the

three projects was Tritech's being commissioned by RMLS to develop and build a

comprehensive web-based computer system (software) in the area of mathematics, memorialized

---

[3] Randolph Williams is no relation to Stapleton or to Veronica Williams.

in a letter date May 15, 2005.  This system CyberQuest, was to be adaptable in customizing curriculum per instructor directives.  Besides designing the software program TriTech provided all services pertaining to maintenance and operation of the application.  TriTech also provided training, data support, development of user guides and acted as a liaison with the users in the IT community.

114.    RMLS did not have any programmers or employees experienced in software development prior to TriTech's assistance.  RMLS did not create the CyberQuest program; rather, Johnson/RMLS purchased it from MIT.  Randolph Williams requested to speak to the original developers because Tritech programmers had major problems understanding the code. Attempts were made but Williams was never able to speak to the author of the CyberQuest program.  RMLS never looked at the software code and did not know how to fix it.  The software application was not running until TriTech fixed the CyberQuest program, in approximately 2007. In approximately 2010 or 2011.  Tritech assisted with the installation of the RMLS server to the African American Cultural center in NM.  In approximately 2018, Tritech converted CyberQuest to a Linux based program.  Williams believes that CyberQuest does not function without him or TriTech.

115.    Although TriTech was doing all of the work, Randolph Williams never felt like he could branch out on his own because RMLS owned the CyberQuest copyright.  Williams first saw the copyright in 2018/2019, when the Request for Proposal (RFP) to APS came out. Williams never saw the CyberQuest patent.  Throughout the duration of TriTech's business relationship with RMLS, TriTech was always a subcontractor for RMLS, however sometime APS paid TriTech and sometime RMLS paid Tritech.  Tritech sent invoices to the attention of Thompson and then Johnson via email.

116.     Stapleton was the primary APS contact person.  Randolph Williams communicated with Stapleton by phone and email.  Whatever email address Stapleton sent an email from was the email address Williams replied to.  Williams was never told to exclusively communicate through Stapleton's personal email address, but Stapleton told Williams to work "off-line" and send correspondence to her personal email address when working on "modules".  Modules are what APS writes up as a request for its needs, much like "whitepaper" in government.   Prior to sending an email to Stapleton's APS work email address, Stapleton wanted to ensure Williams and her were on the same page when writing modules for CyberQuest, before letting other APS employees see the work APS was requesting.  For example, Williams received an email from Stapleton's personal email address Sheryl.Stapleton@yahoo.com, on November 30, 2020.  In this email, Stapleton wrote a draft SOW and provided it to Williams for review and input.  In the email correspondence, Stapleton instructed Williams to add additional information.  APS sent out the SOW, and RMLS/TriTech responded to the SOW, which Williams had already provided input.

117.     In an email sent to Williams, dated October 16, 2020, from the same Stapleton Yahoo email address, Stapleton wrote up a workshop bid totaling $7,500.  Williams knew in advance the work needed for APS from RMLS/TriTech.  Stapleton informed Williams that APS was willing to pay $7,500 per workshop so Williams knew to invoice APS for $7,500 or below when the SOW came from APS.

118.     An email from Stapleton's Yahoo email address, dated March 2, 2021, was sent to Randolph Williams and the email address of jjohnson99403@aol.com.  In the email, Stapleton explained that she was sending Johnson and Williams a draft proposal for the APS middle school

work. Williams needed to create a RMLS letterhead.  Stapleton instructed Williams to send the document to Johnson for his signature.

119.    TriTech provided professional development trainings for teachers, and all of these were related to CyberQuest.  TriTech did not do any other work for APS other than CyberQuest. Although the training seminars were related to CyberQuest and TriTech was a subcontractor to RMLS, TriTech obtained their own APS vendor number in order to be paid for the teacher trainings.  The vendor number was 33064 which was different than RMLS's vendor number of 24574.

120.    Prior to RFP #19-032 RMS, TriTech was paid approximately $50,920 directly by APS.  After the RFP, RMLS was supposed to pay Tritech directly.  Approximately $182,180 was identified as RMLS payments to Tritech.

121.    Unbeknownst to Randolph Williams, RMLS also billed APS for the same professional development trainings.  For example, Tritech billed APS $5,500 for a training held on May 31 to June 1, 2018, while RMLS billed APS $28,000 for the same training even though TriTech performed all the work.

122.    Randolph Williams felt TriTech was carrying the entire CyberQuest project. RMLS only held the copyright.  Williams wrote and did all of the work in preparing the 2019 APS RFP response with TriTech being the intended prime contractor but both Stapleton and Johnson told Williams that TriTech could not be the prime contractor, that it had to be RMLS.

123.    TriTech continued to carry the CyberQuest project following the 2019 RFP.  In an email from Johnson to Randolph Williams, dated April 27, 2021, Johnson told Williams that he was going to use the maintenance work to make the case that they turn those dollars for enhancements and professional development.  Johnson asked Williams what in his opinion is the

best way to format.  The email was part of an email string forwarded from Stapleton to Williams because the APS accounting and procurement department is inquiring about services rendered prior to making payment.  Prior to Stapleton forwarding the email to Williams, APS accounting wrote that they will reach out to the vendor directly so there was no need for Stapleton to send the email to Williams.

124.    Although TriTech was sporadically paid from RMLS over the course of many years, Randolph Williams continued performing services for RMLS.  Williams hoped that with the 2019 APS RFP, TriTech would begin to consistently receive payment from RMLS.  Johnson used excuses and told Williams that APS was not paying RMLS.  Williams believed Johnson when told that APS was not paying.

125.    Dating back to approximately 2014, Randolph Williams periodically sent emails to jjohnson99403@aol.com to inquire about receiving payment for services that TriTech rendered to APS.  Williams never received correspondence from Smith, and Williams never met her.  Thompson told Williams that Smith was an accounting person for RMLS.  When paid, Williams usually received a check via the mail.  There were approximately two occasions when Williams met Johnson in person to receive payment in the form of a check.

126.    On October 20, 2020, in an email having the subject line CyberQuest Work, Randolph Williams wrote the following to Johnson:

> Over the last several months, I mentioned to you that TriTech has several bills to pay for the CyberQuest project. As of today, we have not been paid and we do not have the funds to continue with the effort. I have been informed by my CPA to discontinue this effort and to take legal action. However, I know that we can come up with a plan to continue. I have not informed the client that we are doing a stop work. The total amount that is owned by Robotics Learning is about $141,000. I know that we can agree on an amount, however, I need $87,000 to get the project running smoothly please see your text message from Sunday, October 11, 2020. Secondly, on Friday, July 3, 2020, another text was sent to you asking for some type of payment. We need to work together to get this project done. I understand that we are all busy, but I cannot continue to carry this debt. Last

*weekend training went well with the New Mexico teachers, however, even more, tasks were given. We need to settle the $90K in enhancement from February 2020 to June 2020. We need to sit down and come up with a reasonable solution to move forward.*

127.    In actuality, APS was paying RMLS, and Johnson was fully aware of these payments.  According to Johnson, as a favor to Johnson, Stapleton picked up APS checks from the RMLS post office box and deposited them into the RMLS bank account.  Johnson provided photographs that Stapleton sent him, either through text message or email correspondence, to prove that she had deposited the funds.

128.    All told, Stapleton's entities received approximately $846,757 more from RMLS than Tritech received from both APS and RMLS, even though TriTech was performing the actual CyberQuest work for APS.

<u>**THE UJIMA FOUNDATION AND**</u>
<u>**THE PRINCE GEORGE'S COUNTY GRANT**</u>

129.    As previously mentioned, Johnson was asked if he had any financial relationships with Stapleton and he replied in the negative.  Records obtained in this investigation have disclosed otherwise.  On October 2, 2015, the Ujima Foundation submitted a request for a non-departmental grant to Prince George's County in Maryland, in the amount of $30,000.  The grant application provided an address for Ujima Foundation of 1869 Brightseat Road, Hyattsville, Maryland address.  Actually, that TriTech's mailing address.  In the request, Johnson is listed as the president and director of the Ujima Foundation.

130.    When Randolph Williams was shown various email correspondence from Thompson to Williams, beginning in or around October 24, 2016, Williams said the email correspondence was the first time that Williams heard about Ujima.  In the email correspondence, Thompson told Williams to bill Ujima, and Williams asked, "who is Ujima and why are we billing them when TriTech has never done any work for them?"  Williams said

Ujima never worked out of the TriTech business address, and he never authorized his business address to be used.  Williams knew nothing about the grant. Johnson or Stapleton never told Williams about Ujima or any other non-profits that the two were associated with.  In the email correspondence with Thompson, Williams asked for the Ujima address, and Thompson instructed Williams to send the invoice to Stapleton.

131.   Upon receipt of the Prince George's grant funds, Stapleton withdrew the funds and purchased the following cashier's checks with UF money:



## THE EDUCATION CENTER

132.    On May 24, 2022, agents interviewed Sharon Dogruel regarding her non-profit, The Education Center, and The Education Center's association with RMLS and Stapleton.

133.    In 2004, Dogruel created The Education Center.  The mission of the non-profit is to provide professional development, program evaluation, and program development.  Dogruel is the only employee of the non-profit.

134.    During the same 2004 timeframe, Dogruel worked at the New Mexico Legislature as a policy analyst.  Dogruel worked at the Legislature for 20 years and it was at the Legislature, where Dogruel met Stapleton.  Stapleton asked Dogruel to be one of her analysts at the Legislature.  Dogruel worked during the session and was part of the majority leader staff through contract work for which she was paid.  Dogruel reported to Stapleton.

135.    While working at the NM Legislature, Stapleton approached Dogruel about CyberQuest and how help was needed for APS teachers to learn the system.  Since CyberQuest was based in the Washington DC area, it was not reasonable to have someone continually fly to NM, so Dogruel was the local CyberQuest presence.  Through her work at The Education Center, Dogruel provided professional development services to APS under Stapleton's direction.

136.    While providing professional development services to APS, Dogruel reported to Stapleton and not to Johnson, whom she knew to be the owner of RMLS.  Prior to the RFP, RMLS did not pay Dogruel for CyberQuest services she provided to APS, APS paid for these services.  APS records disclosed that APS paid The Education Center approximately $61,717.99 from 2007 through 2020.  Since 2019, RMLS has paid The Education Center approximately $2,000 for CyberQuest professional development services. Sharon Dogruel was paid $1,100 from RMLS in 2021.

137.    In order to receive payment, Dogruel submitted The Education Center invoices to Stapleton.  These invoices were usually sent by email to Stapleton's personal Yahoo email address.  Stapleton asked Dogruel to send correspondence to her personal email address because Stapleton said she had troubles receiving emails at her APS work email address.

## NEW MEXICO PUBLIC EDUCATION AND HOUSE BILL 91

138.    On July 13, 2021, agents interviewed Dr. Elaine Perea from the PED.  At the time, Dr. Perea was the director of the College and Career Readiness Bureau (CCRB).  Part of her duties were to oversee and provide state and federal funding for the state's CTE programs.

139.    Dr. Perea was excited when HB91 passed and wrote an RFP for curriculum development that would fulfill the requirements of the bill.  The PED received two bids pursuant to the RFP and RMLS was not one of the bidders.  A company in Raton, NM, called REC3 was awarded the bid.

140.    In or around October 2019, the PED began announcing the project that would fulfill the HB91 requirements.  Shortly after PED's announcement, Dr. Perea received a phone call from Dogruel. Dogruel informed Dr. Perea that PED's program was not what the "Representative" intended with HB91, and that PED should use RMLS for the program.  Prior to that conversation, Dr. Perea had never heard of RMLS.  Dogruel told Perea that APS had been using RMLS and they were a really good company and "we" expect the state to contract with them for all the districts.  There are 97 school districts in NM.   In October 2019, Dogruel showed up at Perea's office to have a sit-down.  Dogruel told Perea the intent behind the bill was for the districts to make the integration and curriculum determinations themselves, not for the PED to do it.  Dogruel told Perea she needed to "recalibrate her thinking."  Perea felt bullied and believed Stapleton was behind Dogruel's contact with Perea.  Perea felt Stapleton and Dogruel were trying to intimidate her.

141.    On October 16, 2019, Dogruel emailed Stapleton's personal Yahoo email address with a subject line of "RFP for Math Curriculum."  Dogruel wrote that she located the RFP and that there are a lot of issues.  Dogruel said she would call but she did not see how it would deliver Stapleton's legislative intent.  Stapleton responded to the email with a thanks and forwarded the email to TriTech's Williams.  Stapleton wrote, "I do not suggest that you apply for this."  Williams forwarded the email to Johnson with an FYI.

142.    Perea reported Dogruel's concerns to her chain of command including the Deputy Secretary of Education for NM.  Perea felt she was being directed to do things not in line with her understanding of HB91.  Additionally, someone reported issues on how HB91 was being administered by the PED to the Governor's office.

143.     Meetings were held within the PED and ultimately, the PED compromised and the RFP to REC3 was rescinded.  The CTE funding utilizing NextGen state funds would be controlled at the local school district level and not by PED.  It was also during this timeframe that Dr. Perea was demoted from her position.

144.     An email string to Williams from Stapleton's personal email address, dated December 9, 2019, disclosed Stapleton would contact Williams the following morning.  The email string was in reference to the PED's Next Gen CTE Request for Application (RFA).  Also included in the correspondence from Stapleton is a signature line that stated "sent via the Samsung Galaxy S7 edge, an AT&T 4G LTE smartphone."  Stapleton wrote the following to Williams:

> *I do not know what you are expecting. The public education department sent an email to joe which he sent to you. You will not be applying to the department, the schools will. That is why I sent you the informational memo and all the emails to the school superintendents for you to send back to them letting them know you exist and to please contact you for information and you need to send them the sample link to view what you have available and let's hope this works.*

145.     On December 14, 2019, correspondence from Stapleton's Yahoo email address was sent to Williams and Johnson, with instructions for Williams to contact other New Mexico school districts in hopes that five or six of the schools would write the CyberQuest program into their grant program.

### THE UNIVERSITY OF NEW MEXICO'S SUMMER PROGRAM

146.     Since December 5, 2005, UNM contracted with RMLS under their Morrisey Hall Distance Learning/Performing Arts Research and Public Service Project (RPSP) to provide the CyberQuest software for students enrolled in APS.  According to the New Mexico Higher Department of Education, CyberQuest is an interactive internet accessible mathematics and science course that consists of three interconnected parts including text materials, an interactive

teaching program, and a database to monitor participation and produce reports.  Also included in the services are professional development for instructors and supplies for offices or students.

147.    During this timeframe Stapleton, in her position at the Legislature, introduced HB 479.  According to the New Mexico Legislature website, the proposed legislation was for the board of regents at UNM for the Charlie Morrisey Research Hall to provide a distance learning web-based mathematics and science curriculum using the CyberQuest learning program and robotic teaching software.  The amount appropriated was $150,000.  HB479 did not pass.

148.    In 2007, Stapleton requested and was successful in obtaining House Capital Outlay funds (House Capital Outlay Request 19).  The board of regents for UNM was appropriated $80,000 for the purchase and installation of distance learning equipment at the Charlie Morrisey research center for the department of African American studies.

149.    Not only did Stapleton use her position at the legislature to appropriate funds, she was involved in assisting RMLS with submitting invoices to UNM for payment.  In an email string starting on or about November 28, 2017, UNM requested that Johnson provide invoices for July 2017-October 2017.  Johnson forwarded the email to Stapleton's personal Yahoo email address with an FYI.  Stapleton responded to Johnson with the following:

> *I need talk to you about this please when you have time. Originally, you had said that and sent me the first set of invoices that Andre (Thompson) had sent in. I thought these were already paid. But I see that according to this correspondence, there were paid now in December. When I sent you the last four invoices, I told you, you need an invoice. However, you sent them without an invoice number so do you want me to go back and add the invoice number and send them back to you and them you will resent them to them. Or did they pay on those invoices for the ones Andre has already sent in. I was thinking that those were paid for already, but I guess not.*

150.    All of the RMLS invoice appear to be electronically generated from a template.

151.    From fiscal year (FY) 2006 to FY2021, RMLS charged UNM $519,285.78 for services.

## NEW MEXICO ATTORNEY GENERAL'S OFFICE SEARCH WARRANTS

152.    Documentary evidence has demonstrated that Stapleton routinely forwarded documents to and from her personal Yahoo email account to her APS email account when working on RMLS matters.

153.    Documentary evidence gathered in the investigation shows email correspondence from Stapleton's personal email address to TriTech with an email signature of "sent via the Samsung Galaxy S7 edge, an AT&T 4G LTE smartphone."

154.    Johnson admitted to sending Stapleton an old phone that previously belonged to him so that she could use it for "karaoke" at the Taste of Caribbean.

155.    On July 27, 2021, the New Mexico Attorney General's Office (NMAGO) executed a search warrant (D-202-SW-2021-01951) at the property and premises of Albuquerque Public Schools Main Office located at 6400 Uptown Blvd. NE, Albuquerque, New Mexico 87110.  A NMAGO Search Warrant Return and Inventory Supplemental record obtained from the NMAGO disclosed the following DEVICES were taken into the NMAGO's evidence inventory (this affidavit corrects typos observed between the NMAGO inventory and the evidence transferred to the IRS):

| Device # | Description | Location |
|---|---|---|
| 1 | Eight thumb drives | In or on Stapleton's main desk at APS |
| 2 | Dell OptiPlex 9030 Tag #1F65R52 | On Stapleton's APS CTE desk |
| 3 | Dell OptiPlex 5480 Tag#6SHTJD3 | On Stapleton's APS CTE desk |

156.    On July 28, 2021, the NMAGO executed a search warrant (D-202-SW-2021-1968) on a Volvo bearing license plate number: RCL-854 and registered to Stapleton.  A NMAGO Search Warrant Return and Inventory Supplemental record obtained from the NMAGO disclosed the following DEVICES were taken into the NMAGO's evidence inventory:

| Device # | Description | Location |
|---|---|---|
| 4 | Galaxy S7 (Model: SM-G935ABLK32, IMEI: 357216071686860) | In the center panel of a Volvo, bearing license plate number: RCL-854, registered to Stapleton |
| 5 | iPhone (IMEI:354437068374244, Model: A1524) | In a shipping box in the Volvo registered to Stapleton.  The shipping box was addressed to Stapleton and was sent from Johnson. |

157.    On July 28, 2021, the NMAGO executed search warrant D-202-SW-2021-1968 at the property and premises of 4616 Crest Avenue SE, Albuquerque, New Mexico 87108, which is the known personal residence of Stapleton.  Your Affiant was present at the search warrant.

158.    Stapleton's home office was identified by photographs and plaque items that hung on the wall surrounding the desk including photos, awards, and plaques of or in the name of Stapleton, including one photo of Stapleton with Al Gore.  The home office also contained check book items bearing the name of Stapleton, to include a large manilla envelope addressed to Stapleton with a return address of RMLS.

159.    Stapleton's bedroom was identified by four prescription pill bottles prescribed to Stapleton.  The bedroom also had credit card and bank account items bearing the name Stapleton, APS check stubs payable to RMLS, and a Bank of America deposit slip, dated March 10, 2017, for RMLS in the amount of $80,000.

160.    A NMAGO Search Warrant Return and Inventory Supplemental record obtained from the NMAGO disclosed the following DEVICES were taken into the NMAGO's evidence inventory (this affidavit corrects a typo observed between the NMAGO inventory and the evidence transferred to the IRS):

| Device # | Description | Location |
|---|---|---|
| 6 | AT&T Cellphone | On a bed, adjacent to a purse, in a spare bedroom in the residence |
| 7 | Dell Laptop (S/N: 2L6F162) | Under a desk in a DELL shipping box in Stapleton's home office |

| Device # | Description | Location |
|----------|-------------|----------|
| 8 | Dell Laptop (S/N: HT5WKX1) | Under a desk in a DELL shipping box in Stapleton's home office |
| 9 | Dell Laptop (Prod No: 686WKX1) | Under a desk in a DELL shipping box in Stapleton's home office |
| 10 | Dell Laptop (Model: P36G) labeled "Property of APS" | Under a desk in a DELL shipping box in Stapleton's home office |
| 11 | Dell OptiPlex 755 Tower (Service No. FSDX3G1) | On a desk in Stapleton's bedroom |
| 12 | Dell Laptop (S/N: 54WR2S1) | On or adjacent to a nightstand in Stapleton's bedroom |
| 13 | Dell Laptop (S/N: 7BJYPV2) labeled "Property of APS Schools 787898" | In Stapleton's bedroom |
| 14 | Dell Laptop (S/N: F31F162) labeled "Property of APS 729153" | In a computer bag in Stapleton's bedroom |
| 15 | Tablet (Model T004, S/N 00160253-LE1600) | In a container between a dresser and a wall in Stapleton's bedroom |
| 16 | Dell Laptop (Model: PP18L Service No: 8DXR3H1) | In a container between a dresser and a wall in Stapleton's bedroom |
| 17 | Dell Laptop (Model: PP15L Service No: FDLHM81) | In a container between a dresser and a wall in Stapleton's bedroom |
| 18 | Dell Laptop (Model PP13S, Service No: FZDCTL1) | In a container between a dresser and a wall in Stapleton's bedroom |
| 19 | Dell Laptop (Model: PP05L, Service No: DYLX641) | In a container between a dresser and a wall in Stapleton's bedroom |
| 20 | Blu Phone | In Stapleton's bedroom, in a drawer of the dresser containing prescription pills prescribed to Stapleton |
| 21 | Samsung Galaxy S7 (IMEI :359470073570030) | On the kitchen table of Stapleton's residence, in a black wallet case containing a Bank of American business debit card in the names of Taste of Caribbean and Stapleton. |
| 22 | Dell Laptop (S/N: 87P6TQ2) labeled "State of New Mexico Legislative Council Service LEG19L87P6" | In a spare room of the residence |
| 23 | Dell All-in-one (S/N: BRFNCP2) | In a spare room of the residence with item 22 |
| 24 | Dell OptiPlex 360 tower (S/N: 69NZ3J1) | In a storage/utility closet next to the laundry room, in Stapleton's residence |

161.    The factual grounds for the executed search warrants are stated in the affidavit

that was sworn to in the State of New Mexico, County of Bernalillo on July 21, 2021.

162.     On September 27, 2022, the NMAGO released the aforementioned seized

DEVICES or images of said DEVICES to your affiant.  These DEVICES are currently being

held in the IRS CI's Albuquerque, New Mexico, Post of Duty Office evidence room for safe

keeping located at 6200 Jefferson St. Albuquerque, NM 87109.

163.     For the reasons stated above, I believe that probable cause exists to search the

devices identified in Attachment A, previously seized by the NMAGO on July 27, 2021, and July

28, 2021, for evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 666, Theft or

bribery concerning programs receiving Federal funds, 18 U.S.C. § 1343, Wire Fraud, Title 18

U.S.C. § 1346, Honest Services Fraud, and 18 U.S.C. § 1956, Laundering of monetary

instruments.  I believe that evidence articulated in this affidavit supports probable cause that

Stapleton and Johnson have committed fraud by transferring money from the RMLS bank

account(s) and using this money for purposes other than intended.  I believe evidence of these

crimes will exist on the computers and cellular devices used by Stapleton and are further

described in Attachment A.  Based on my training and experience, I know that these crimes are

often perpetuated through emails and the use of the internet.  I also know that company records

and documents stored as physical copies, as well as digitally in computers, provide evidence of

the movement of money.

### **TECHNICAL TERMS**

164.     Based on my training and experience, I use the following technical terms to

convey the following meanings:

a.     Computer:  Any of the specific electronic devices listed in Attachment A

comprised of desktop computers, laptop computers, all-in-one (AIO) computers,

tablets, cellular telephones, and USB thumb drives.

b.      Storage Medium:  A storage medium is any physical object upon which computer

data can be recorded. Examples include hard disks, solid state disks, RAM, floppy

disks, flash memory, CD-ROMS, and other magnetic or optical media.

**COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS**

165.     As described above and in Attachment B, this application seeks permission to

search for records that might be found on the devices, in whatever form they are found.  One

form in which the records might be found is data stored on a computer's hard drive or other

storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage

media or, potentially, the copying of electronically stored information, all under Rule

41(e)(2)(B).

166.     I submit there is probable cause to believe these records will be stored on that

computer or storage medium, for at least the following reasons:

a.      Based on my knowledge, training, and experience, I know that computer files or

remnants of such files can be recovered months or even years after they have been

downloaded onto a storage medium, deleted, or viewed via the Internet.

Electronic files downloaded to a storage medium can be stored for years at little

or no cost.  Even when files have been deleted, they can be recovered months or

years later using forensic tools.  This is so because when a person "deletes" a file

on a computer, the data contained in the file does not actually disappear; rather,

that data remains on the storage medium until it is overwritten by new data.

b.      Therefore, deleted files, or remnants of deleted files, may reside in free space or

slack space—that is, in space on the storage medium that is not currently being

used by an active file—for long periods of time before they are overwritten.  In

addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

167.    *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers,

e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.  As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating, or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.

For example, as described herein, computers typically contain information that log computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.  Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera).  The geographic and timeline information described herein may either inculpate or exculpate the computer user.  Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.  For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

168.  *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted

scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

169.    *Manner of execution.*  Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

170.    Based on the above information, I submit that this affidavit supports probable cause that Stapleton, while serving as the CTE Director for APS and the Majority Whip for the NM House of Representatives and Johnson, while serving as president and CEO of RMLS, committed wire fraud and laundered monetary instruments in violation of 18 U.S.C. § 666, Theft or bribery concerning programs receiving Federal funds, 18 U.S.C. § 1343, Wire Fraud, Title 18 U.S.C. § 1346, Honest Services Fraud, and 18 U.S.C. § 1956, Laundering of monetary instruments.  I also have probable cause to believe that the items described in Attachment A contain evidence, contraband, fruits and/or instrumentalities related to these violations, as set forth in Attachment B.  I respectfully, request that this Court issue a search warrant for the items described in Attachment A authorizing the seizure of the items described in Attachment B. The affiant states that the above statements are true and correct to the best of her knowledge, information, and belief.

Respectfully submitted,

Crystal L. Chavez
Special Agent
IRS-Criminal Investigation

Submitted electronically and Sworn telephonically before me

XXXXXXXXXXXX   On January 17, 2023.

UNITED STATES MAGISTRATE JUDGE

# ATTACHMENT A

## DESCRIPTION OF ITEMS TO BE SEARCHED

The items to be searched are the following DEVICES, currently located in the IRS Criminal

Investigations evidence room at 6200 Jefferson St. NE, Albuquerque, NM 87109:

| Device # | Description |
|---|---|
| 1 | Eight thumb drives |
| 2 | Dell OptiPlex 9030 Tag #1F65R52 |
| 3 | Dell OptiPlex 5480 Tag#6SHTJD3 |
| 4 | Galaxy S7 (Model: SM-G935ABLK32 IMEI: 357216071686860) |
| 5 | iPhone (IMEI:354437068374244, Model: A1524) |
| 6 | AT&T Cellphone |
| 7 | Dell Laptop (S/N: 2L6F162) |
| 8 | Dell Laptop (S/N: HT5WKX1) |
| 9 | Dell Laptop (Prod No: 686WKX1) |
| 10 | Dell Laptop (Model: P36G) labeled "Property of APS" |
| 11 | Dell OptiPlex 755 Tower (Service No. FSDX3G1) |
| 12 | Dell Laptop (S/N: 54WR2S1) |
| 13 | Dell Laptop (S/N: 7BJYPV2) labeled "Property of APS Schools 787898" |
| 14 | Dell Laptop (S/N: F31F162) labeled "Property of APS 729153" |
| 15 | Tablet (Model T004, S/N 00160253-LE1600) |
| 16 | Dell Laptop (Model: PP18L Service No: 8DXR3H1) |
| 17 | Dell Laptop (Model: PP15L Service No: FDLHM81) |
| 18 | Dell Laptop (Model PP13S, Service No: FZDCTL1) |
| 19 | Dell Laptop (Model: PP05L, Service No: DYLX641) |
| 20 | Blue Phone |
| 21 | Samsung Galaxy S7 (IMEI :359470073570030) |
| 22 | Dell Laptop (S/N: 87P6TQ2) labeled "State of New Mexico Legislative Council Service LEG19L87P6" |
| 23 | Dell All-in-one (S/N: BRFNCP2) |
| 24 | Dell OptiPlex 360 tower (S/N: 69NZ3J1) |



**ATTACHMENT B**

**DESCRIPTION OF ITEMS TO BE SEIZED**

All records, data, digital files and information, or items consisting of the fruits, instrumentalities, and evidence of violations of 18 U.S.C. § 666, Theft or bribery concerning programs receiving federal funds, 18 U.S.C. § 1343, Wire Fraud, Title 18 U.S.C. § 1346, Honest Services Fraud, or 18 U.S.C. § 1956, Laundering of Monetary Instruments, in connection with the application for and receipt of Carl Perkins federal grant funds, House Bill 91, NextGen Grants, State Special Capital Outlay Funds, House Bill 33 Capital Improvements, Senate Bill 9 Capital Improvements, for the period of January 1, 2006 through July 27, 2021, to include the items listed below:

a.  Books and records pertaining to Sheryl Williams Stapleton (aka Sheryl Williams, Sheryl Hendrickson, Sheryl Stapleton, Sheryl Hendrick Williams), Joseph Johnson, Robotics Management Learning Systems LLC, CyberQuest, Taste of Caribbean a/k/a Taste of Caribbean El Sabor De Caribe LLC, S Williams and Associates, Ujima Foundation, Charlie Morrisey Scholarship Committee, or The Education Center.

b.  Evidence of who used, owned, or controlled the computer and electronic storage devices at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence.

c.  Evidence of software, or the lack thereof, that would allow others to control the computer and electronic storage devices, such as viruses, Trojan horses, and other

forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software.

d. Evidence of the attachment to the computer of other storage device or similar containers for electronic evidence.

e. Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the computer and electronic storage devices.

f. Evidence of the times the computer and electronic storage devices were used.

g. Passwords, encryption keys, and other access devices that may be necessary to access the computer and electronic storage devices.

h. Documentation and manuals that may be necessary to access the computer and electronic devices or to conduct forensic examination of the computer and electronic devices.

i. Records of, or information about the computer's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

j. Any and all records, documents, ledgers, grant applications, or materials, including, but not limited to, grant award letters, emails, notes, letters, and texts, chats, and logs.

k. Electronic records reflecting the distribution of federal and non-federal payments, including, but not limited to, bank records, statements, ledgers, deposit slips, checks, and account numbers.

m.  Email addresses, email messages and correspondence, or any correspondence which describes or contains information of financial transactions; invoices; purchase orders.

n.  Electronic correspondence, memoranda, mail, notes, other documents bearing the identification of any school, university, or post-secondary institution.

o.  Electronic correspondence, memoranda, mail, notes, other documents reflecting communication between Stapleton and the associated entities identified.

p.  Records concerning daily appointments, activities, meetings, communications, and whereabouts for Stapleton and/or individuals and entities with whom Stapleton worked with our used to commit violations of the crimes identified.

q.  Photographs that pertain or relates to a scheme to defraud any sum of federal and non-federal grant funds.

r.  originals and copies of all income tax returns and their associated forms, work papers, information sheets and taxpayer records.

s.  business income and expense records such as receipt books, journals, ledgers, billing records and invoices, point of sale system records and receipts, deposit slips, cancelled checks, bank statements, payroll records, cash receipts and cash expense journals, worksheets, schedules, cashier checks, money orders, investment accounts, financial statements, income statements, balances sheets, trial balances, accounting records, records of purchases and revenues received, and payroll records.

t.   Bank, financial institution, and investment account records, checkbooks, statements, deposit slips, canceled checks, cashier's checks, loan records, financial statements, credit reports, records of wire transfer, and keys to safe-deposit boxes.

u.   Documents constituting, listing or describing domestic trusts or other foreign entities created on behalf of any of the above-mentioned individuals or businesses, including articles of incorporation, certificates or licenses of incorporation, bylaws, corporate resolutions, trust agreements, list of foreign directors, officers, mangers or trustees and abstracts of memoranda.

v.   Any and all copies of Internal Revenue Service publications and documents, including correspondence, manuals, and notices.

w.   Power of Attorney forms, notary stamps, notary seals, notary logs, books and all other items related to Notary Public functions.

x.   Documents, including the passports and airline tickets, correspondence, itineraries, reservations forms, and receipts, showing travel by the abovementioned individuals

As used above, the terms "records" and "information" includes all forms of creation or storage contained on the computer and electronic storage devices.